UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DAVID FINNEMAN,<br><br>          Plaintiff,<br><br>    vs.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, RISK MANAGEMENT<br>AGENCY, and THE FEDERAL CROP<br>INSURANCE CORPORATION,<br><br>          Defendants. | 5:23-CV-05034-KES<br><br><br>ORDER DENYING MOTIONS FOR<br>SUMMARY JUDGMENT |

Defendants, United States Department of Agriculture (USDA), Risk Management Agency (RMA), and The Federal Crop Insurance Corporation (FCIC) move for summary judgment on plaintiff, David Finneman's, prayer for review and reversal of an administrative determination that Finneman is not entitled to an FCIC determination that his insurance prover, ProAG, failed to comply with FCIC policies or procedures. Docket 36. Finneman also seeks summary judgement on the issue of whether defendants must provide the non-compliance determination. Docket 39. Finneman opposes defendants' motion for summary judgment. Docket 42. Defendants oppose Finneman's motion for summary judgment. Docket 46.

## Background

David Finneman obtained a 2017 Whole Farm Revenue Protection (WFRP) Pilot Policy for the 2017 crop year through ProAg, an approved insurance provider (AIP). Docket 43 ¶ 1. The basic function of a WFRP policy is to "provide[] protection against loss of revenue that [the policyholder] expect[s] to earn or will obtain from commodities [the policyholder] produce[s] or purchase[s] for resale during the insurance period." Docket 1-1 at 1. Such policies are regulated by the Federal Crop Insurance Act (FCIA) and the FCIC. *See* Federal Crop Insurance Act, 7 U.S.C. §§ 1501–1524. Previously, the FCIC provided crop insurance directly to producers, but today the FCIC contracts with AIPs. *Am. Growers Ins. Co. v. FCIC*, 532 F.3d 797, 798 (8th Cir. 2008). Through the FCIA and "related regulations issued by the Secretary of Agriculture," the FCIC exercises "significant control over all aspects of the federal crop insurance program." *Id.* "Though [a federal crop insurance] policy is a contract between a farmer and an insurance provider, the FCIC determines the terms and conditions of federal crop insurance policies." *Balvin v. Rain & Hail, LLC*, 943 F.3d 1134, 1136 (8th Cir. 2019).

ProAg issued Finneman a WFRP policy for the 2017 crop year. *See* Docket 1-1 at 1; Docket 43 ¶ 1. This policy purported to insure 316 acres of corn and 280 acres of safflower planted by Finneman. *See* Docket 1-2 at 2. The insured on the WFRP policy was listed as the individual "David Finneman[.]" *See* Docket 1-2 at 1. The terms of the contract were contained in the standard form 2017 WFRP Pilot Policy promulgated by the FCIC. *See* Docket 1-1.

The WFRP Pilot Policy protects "approved revenue" that the policyholder earns or expects to earn from commodities produced or purchased during the policy period. *See* Docket 1-1 at 18. "Approved revenue" is the amount of "allowable revenue" that is approved by the insurer, and "allowable revenue" is "farm revenue, specified by the policy and including applicable adjustments," that is required to be reported to the Internal Revenue Service (IRS). *Id.* at 3. Allowable revenue also includes "[t]he sales of animals, produce, grains and other commodities [the policyholder] raised" as reported in Line 2 of the Schedule F tax form submitted to the IRS by the policyholder. *Id.* at 19. Under the contract, the policyholder was required to submit to ProAg a "Whole-Farm History Report" that included the policyholder's Schedule F tax forms that had been submitted to the IRS for a five-year period. *See id.* at 24. The policy provided for indemnity if the insured's "revenue-to-count" fell below the insured revenue, the latter of which was calculated using approved revenue multiplied by the percentage of the revenue the policyholder elected to insure at their coverage level. *See id.* at 19; Docket 1-2 at 1 (showing Finneman's coverage level to be 75%). The schedule of insurance distributed to Finneman by ProAg for insurance year 2017 showed an approved revenue of $196,128, which, when multiplied by his coverage level of 75%, produced a "Whole-Farm Liability" of $147,096. *See* Docket 1-2 at 1–2.

ProAg also sold five traditional multiple peril crop insurance policies to C&D Acres, LLC, covering the 2017 crop year for acres of safflower and soybeans that were planted by the entity. *See* Dockets 1-4, 1-5, 1-6, 1-7, 1-8.

3

C&D Acres is a limited liability corporation originally established by Finneman and his then spouse, Connie Finneman. *See* Docket 1-3. In 2011, a document signed by Finneman and Connie Finneman was filed with the South Dakota Secretary of State that stated that Connie Finneman had voluntarily disassociated from C&D Acres. *See id.*

Finneman filed a notice of loss under his individual WFRP policy on July 5, 2017. *See* Docket 1-9 at 1. Then, following the filing of his 2017 taxes, Finneman submitted an insurance claim to ProAg under the WFRP policy. *See id.* On April 20, 2018, ProAg informed Finneman that his policy was voided for two reasons. *See id.* at 2-3. First, because the Whole-Farm History Report required by § 16(a)(3) of the WFRP Pilot Policy failed to list revenue from C&D Acres, despite Finneman having listed C&D Acres income on his Schedule F form that was submitted to the IRS. *See id.* at 2. ProAg stated that, even if the policy was not voided, all revenues earned by C&D Acres would have been classified as revenue-to-count, thus reducing any indemnity accordingly. *See id.* Second, ProAg voided the policy because Connie Finneman had a special beneficial interest (SBI) that was not listed on Finneman's individual policy. *Id.* at 2–3. In its letter, ProAg asserted that the spouse of an applicant is presumed to have an SBI unless the spouses can show that they are legally separated. *Id.* at 3. As a result of the policy's voidance, ProAg informed Finneman that it would retain 20% of Finneman's previously paid insurance premiums and not pay Finneman's claim for the losses on the acres of corn and safflower he had insured under his personal WFRP policy. *Id.* at 4.

4

Section 33(a) of the 2017 WFRP Pilot Policy, with limited exceptions, requires that all disputes be submitted to arbitration "in accordance with the rules of the American Arbitration Association (AAA)." Docket 1-1 at 38. Finneman commenced arbitration pursuant to § 33. Docket 1-11 at 1. Finneman disputed ProAg's determination that he was not entitled to indemnity for his 2017 crop failures and sought "indemnity of no less than $147,096." *Id.*

David A. Allgeyer (the Arbitrator) was appointed to arbitrate the dispute. *See* Docket 1-10 at 5. On ProAg's motion for summary disposition, the Arbitrator determined that Connie Finneman did not have an SBI because a separation agreement rendered the Finnemans legally separated under applicable state law. *See id.* at 2–5. Following further proceedings and briefing by the parties, the Arbitrator issued an arbitration award in favor of Finneman, in the amount of $97,781 plus interest. Docket 1-11 at 10. In reaching his decision, the Arbitrator first considered whether ProAg properly denied Finneman's claim for failing to list Connie Finneman as a person having an SBI. *See id.* at 7–8. The Arbitrator found that Finneman and Connie Finneman were legally separated under applicable state law, and thus the policy was not void due to a failure to list a person having an SBI. *See id.* Second, the Arbitrator determined that "C&D's revenue should not have been included in Mr. Finneman's Revenue to Count." *Id.* at 8. In doing so, the Arbitrator relied on an implied "covenant of good faith and fair dealing on the part of the parties" to find that "under the unique facts of this case," C&D's revenue

should have been excluded. *Id.* at 9. Third, the Arbitrator calculated the award to which Finneman was entitled. *See id.* at 10–11.

On July 18, 2022, ProAg requested review of the arbitration award by the Deputy Administrator of the Risk Management Agency (RMA)[1]. *See* Docket 26-1 at 60-69. ProAg argued that the Arbitrator impermissibly rendered an award based on a disputed policy provision for which Finneman failed to request an FCIC interpretation. *See id.* at 60, 64–65. Specifically, ProAg asserted that an interpretation of the term "revenue-to-count" should have been sought. *See id.* at 65. ProAg also contended that the Arbitrator should not have relied on the concept of good faith and fair dealing to support his conclusion that C&D revenue should not have been included in Finneman's revenue-to-count. *See id.* at 67–68. To support its request, ProAg cited § 33(a)(1)(ii) of the WFRP Pilot Policy, which operated to nullify any award where a policy and procedure interpretation should have been sought from the FCIC but was not. *See id.* at 61–62. ProAg also pointed to federal regulations that nullify arbitration awards where a final agency interpretation is erroneously not sought, and that was providing a mechanism for FCIC review of an award under such circumstances. *See id.* at 60–61; 7 C.F.R. § 400.766(b)(3)–(4).

On July 19, 2022, ProAg filed a petition to vacate, or, in the alternative, to nullify the arbitration award. Docket 43 ¶ 4. On October 7, 2022, Finneman

---

[1] The RMA is the agency that manages the FCIC. *See About the Risk Management Agency*, USDA, https://www.rma.usda.gov/About-RMA/ (last visited August 27, 2024).

counterclaimed seeking confirmation of the arbitration award and extracontractual damages. *Id.* ¶ 5.

On October 20, 2022, the FCIC responded to ProAg's request for review of the arbitration award. *See ProAg v. Finneman.*, No. 5:22-CV-05062 (D.S.D. filed July 19, 2022),[2] Docket 13-1. In that letter, the RMA Deputy Administrator determined that the Arbitrator's decision involved a disputed policy provision, for which an agency interpretation should have been sought. *Id.* at 1–2. His letter stated that resolution of the controversy involved the interpretation of two policy questions:

> 1) Whether the WFRP policy and handbook require revenue attributable to commodities grown by a disregarded entity to be considered as part of the insured's allowable revenue for WFRP purposes, and 2) Whether Line 2 of an insured's Schedule F income reported under a single taxpayer identification number must be entered in the Allowable Revenue Worksheet.

*Id.* at 1. The FCIC found that "a disregarded entity" such as C&D Acres "which does not file a separate tax return is part of the farm operation of the tax entity which files a tax return including revenue from that disregarded entity and all revenue reported on Line 2 of the tax entity's Schedule F is considered allowable revenue for that tax entity." *Id.* at 4. According to the FCIC determination, all revenue reported on Line 2 of the Schedule F form should have been included as revenue-to-count when calculating the claim for indemnity and would in effect be subtracted from any indemnity Finneman was due under the policy. *See id.*

---

[2] Hereinafter, the court will refer to filings in *ProAg v. Finneman.*, No. 5:22-CV-05062 (D.S.D. filed July 19, 2022) by inserting the designation of 5:22-CV-05062 before the docket entry.

On October 28, 2022, ProAg filed an answer to the counterclaim. 5:22-CV-05062, Docket 13. ProAg asserted that the counterclaim failed to state a claim on which relief could be granted, citing the RMA decision finding the arbitration award involved a disputed policy provision, and asserted that the arbitration award was automatically nullified pursuant to 7 C.F.R. § 400.766(b)(4)(ii)(a). *See id.* at 1.

ProAg moved for summary judgement on its claims seeking vacatur of the arbitration award and dismissal of the counterclaims with prejudice. 5:22-CV-05062, Dockets 17, 19. Finneman opposed ProAg's motion and moved for summary judgment on Count 1 of the counterclaim seeking confirmation of the arbitration award. 5:22-CV-05062, Dockets 25, 26. When ruling on the cross-motions for summary judgment, the court vacated the arbitration award, remanded the matter to the arbitrator for further proceedings, and dismissed Counts 2 through 6 of the counterclaim without prejudice. 5:22-CV-05062, Docket 33 at 28-29; Docket 34.

On October 7, 2022, the same day that Finneman brought the counterclaim, Finneman submitted a formal request to the RMA pursuant to § 33 of the 2017 WFRP Pilot Policy and 7 C.F.R. § 400.352(b)(4) for an FCIC determination that ProAg failed to comply with the terms of the WFRP Pilot Policy and FCIC procedures. Docket 1-12. Finneman argued that ProAg's failure to comply with the policy or procedures resulted in Finneman receiving an indemnity payment less than the $101,178 to which he asserts he is entitled. *See* Docket 1-12 at 2.

Director of the RMA Administrative Review Division Donnika Stance declined to issue a non-compliance determination on the grounds that the 2017 WFRP Pilot Policy did not have a contract provision equivalent to § 20(i)[3] of the Common Crop Insurance Policies that authorized the FCIC to issue such a determination. Docket 1-13 at 1. In a footnote, the Director discussed a prior NAD determination that barred a party insured under the 2016 WFRP Pilot Policy from requesting and obtaining a non-compliance determination, on the grounds that the 2016 WFRP Pilot Policy did not contain a provision authorizing such a determination. *Id.* at 1 n.1. The Director noted that the revised 2019 iteration of the WFRP Pilot Policy contains a provision equivalent to § 20(i) of the Common Crop Insurance Policy, and therefore provides for a procedure by which the insured may obtain a non-compliance determination. *See id.*; 7 C.F.R. § 457.8(b).

The RMA's decision not to issue a non-compliance determination was appealed by Finneman to an Administrative Law Judge with the National Appeals Division (NAD), who on February 22, 2023, affirmed the FCIC's decision. *See* Docket 1-14; Docket 1-15. Pursuant to 7 C.F.R. § 11.9, Finneman requested NAD Director review of the February 22, 2023, ALJ determination. Docket 1-16. On April 25, 2023, the RMA Director Frank Woods issued a decision (the Director Review Determination) that affirmed the prior agency

---

[3] Section 20(i) is a provision in the model policy provisions codified by the FCIC in the Common Crop Insurance Policy that expressly provides a procedure to obtain a non-compliance determination. *See* 7 C.F.R. § 457.8(b).

decisions and found that the RMA properly applied its regulations in declining to issue a non-compliance determination. Docket 1-17 at 1, 4.

On May 24, 2023, Finneman brought this complaint against defendants seeking "review and reversal of the adverse administrative determination by . . . [d]efendants." Docket 1 at 9. Finneman filed an amended complaint on January 3, 2024. Docket 22. Defendants responded to the amended complaint on January 17, 2024, and filed an amended answer on February 7, 2024. Docket 23; Docket 24. Finneman and defendants filed cross-motions for summary judgment. Docket 36; Docket 39. Finneman opposes defendants' motion for summary judgment. Docket 42. Defendants oppose Finneman's motion for summary judgment. Docket 44.

## Legal Standard on Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no genuine dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must inform the court of the basis for its motion and also identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment "must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik* 47 F.3d at 957. It is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, when considering a motion for summary judgment, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In cases involving cross motions for summary judgment, the standard summary judgment principles apply with equal force, though the approach is slightly modified. *See Woodstone Ltd. P'ship v. City of Saint Paul*, 2023 WL 3586077, at *5 (D. Minn. May 22, 2023). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019).

**DISCUSSION**

Defendants argue that summary judgment should be granted on Finneman's claim because first, Finneman lacks standing; and second, RMA's decision not to issue a non-compliance determination is supported by substantial evidence and may not be set aside under the Administrative Procedure Act (APA) as requested by Finneman. Docket 38 at 6, 9–10. Finneman argues that RMA's decision not to issue a non-compliance determination is arbitrary and capricious. Docket 41 at 8. In the alternative, Finneman urges the court to hold that he does not need a non-compliance determination in order to pursue claims for extracontractual damages against ProAg. *Id.* at 12–14.

## I.    Justiciability

In the Amended Complaint, Finneman asserts four causes of action, all of which allege the same injury: that the Agency's failure to issue a non-compliance determination "resulted in the insured receiving a payment in an amount that is less than the amount to which the insured was entitled[.]" Docket 22 ¶ 46(a)–(d). Defendants assert that Finneman does not have standing because the alleged injury is speculative and therefore Finneman has not suffered an injury in fact and because Finneman's alleged injury is not traceable to defendants. *See* Docket 38 at 8–9.

### A.    Legal Standards

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,

12

is entitled to judicial review thereof." 5 U.S.C. § 702. This statutory right to

judicial review applies to decisions by the RMA, and "permits suits against 'the

United States, the agency by its official title, or the appropriate officer.' "

*Midland Farms, LLC v. U.S. Dep't of Agric.*, 35 F. Supp. 3d 1056, 1062 (D.S.D.

2014) (quoting 5 U.S.C. § 703)); *see also Biby v. U.S. Dep't of Agric.*, 2017 WL

2991440, at *6 (D.N.D. June 7, 2017).

The right to judicial review at 5 U.S.C. § 702 is distinct from the

constitutional requirement of standing to maintain an action in federal court.

*See Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012)

(explaining that Article III standing is a question of justiciability that is distinct

from whether statutory standing exists); *Rosebud Sioux Tribe v. McDivitt*, 286

F.3d 1031, 1036 (8th Cir. 2002) (discussing standing requirements separately

from grant of jurisdiction under the APA). Under Article III of the Constitution,

federal courts may only resolve cases or controversies. *See Zanders v.

Swanson*, 573 F.3d 591, 593 (8th Cir. 2009). To satisfy the case or controversy

requirement, a plaintiff must have standing and be a "proper party to bring [a

particular lawsuit]." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,

576 U.S. 787, 799 (2015) (alterations in original) (quoting *Raines v. Byrd*, 521

U.S. 811, 818 (1997)). The standing requirement maintains the court's limited

role in our democratic government. *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The court's role is not to make policy, nor serve as a forum for citizens to air

general grievances. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–41

(2006) ("If a dispute is not a proper case or controversy, the courts have no

13

business deciding it, or expounding the law in the course of doing so."); *United States v. Hays*, 515 U.S. 737, 743 (1995) (acknowledging courts "have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power"). Instead, the court's role is limited to resolving disputes between two parties with a particularized and concrete stake in the outcome. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013).

Standing has three essential elements: a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical[.]" *Id.* at 560. In other words, "[u]nder Article III, federal courts do not adjudicate hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). An injury is fairly traceable to the challenged conduct of the defendant "if the plaintiff shows 'a causal connection between the injury and the conduct complaint of' that is 'not . . . th[e] result [of] the independent action of some third party not before the court.' " *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) (quoting *Lujan*, 504 U.S. at 560). "For an injury to be redressable, judicial action must be likely to remedy the harm and cannot be merely speculative." *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000).

The court must conduct a standing analysis for each claim separately. *Davis v. FEC*, 554 U.S. 724, 734 (2008). Additionally, a plaintiff must prove "standing for each type of remedy sought, including declaratory and injunctive relief." *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir. 2015). At the pleading stage, the plaintiff "must clearly allege facts demonstrating" the elements of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up).

"[S]tanding is based on the facts as they existed at the time the lawsuit was filed." *Steger*, 228 F.3d at 893. Nonetheless, "Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013)).

## B.    Whether Finneman suffered an injury-in-fact

Defendants argue that Finneman has not suffered an injury-in-fact because his injuries are speculative. Docket 38 at 8. They contend that it is undetermined how the related proceedings between Finneman and ProAg may conclude, and because "plaintiff prevailed when appealing the arbitration decision[,]" his alleged injury does not confer standing. *Id.*

Finneman responds that a "[f]ederal statute grants this [c]ourt specific jurisdiction to review and enforce final determinations of the National Appeals Division." Docket 42 at 2. Finneman is correct that a federal statute provides for review of NAD final determinations. *See* 7 U.S.C. § 6999. But whether the court has jurisdiction to review the NAD Director's final determination is a

separate question from whether Finneman has been injured so as to give rise to Article III standing. *See Miller*, 688 F.3d at 934. Finneman's response fails to respond to defendants' argument that at the time he filed his suit, Finneman had not suffered an injury-in-fact. Instead, Finneman cites district court decisions from within the Eighth Circuit that reviewed NAD final determinations. *See* Docket 42 at 2. But the fact that courts have reviewed NAD determinations where it was not in dispute that the plaintiffs were injured is not necessarily relevant to the issue of whether Finneman suffered an injury-in-fact. For example, in one case cited, the plaintiff challenged an NAD order upholding an administrative determination that part of his property was a protected wetland, and thus, whether he suffered an injury-in-fact was not at issue. *See generally Foster v. Vilsack*, No. 4:13-cv-4060-KES, 2014 WL 5512905 (D.S.D. Oct. 31, 2014), *aff'd*, 820 F.3d 330 (8th Cir. 2016); *see also Midland Farms*, 35 F. Supp. 3d 1056 (Article III standing not at issue); *Wiley v. Glickman*, 1999 WL 33283312 (D.N.D. Sept. 3, 1999) (Article III standing not at issue in case where plaintiffs challenged amendment to terms of FCIC-promulgated insurance policy).

Nonetheless, Finneman's injury is not speculative. First, Finneman's claimed injury, the loss of his indemnity claim, is a quintessential economic injury. *See Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (noting that economic harm typically makes the injury-in-fact analysis "straightforward").

Second, Finneman has not yet received payment for his loss, and absent an FCIC non-compliance determination, it is highly unlikely that he will recover on his extracontractual claims. *See* 7 C.F.R. § 400.352(b)(4) (regulation barring fines, judgments, punitive damages, compensatory damages, or judgments for attorney's fees in the absence of an FCIC non-compliance determination). Although the court does not fully address in the justiciability analysis the issue of whether Finneman can recover on extracontractual claims absent a non-compliance determination, for the purposes of determining whether an injury-in-fact occurred, it is relevant that FCIC Final Agency Determinations have established that extracontractual claims, even those sounding in misrepresentation at the time of contract formation, are not permitted absent a non-compliance determination. *See* RMA Final Agency Determination 240 (U.S.D.A. 2015) ("Any claim, including a claim for extra-contractual damages solely arising from a condition related to policies of insurance issued pursuant to the [FCIA], may only be awarded if a determination was obtained from FCIC in accordance with section 20(i) of the Basic Provisions and § 400.176(b)."). (U.S.D.A. 2015) (agreeing with requestor interpretation and finding that 7 C.F.R. § 400.352 prohibits claims for extra-contractual damages absent a non-compliance determination, "including where there were negligent or intentional AIP misrepresentations upon which the producer relied").

Once the FCIC determined that the Arbitrator failed to seek a necessary policy or procedure interpretation, the arbitration award was automatically nullified. *See* 7 C.F.R. § 400.766(b)(4)(ii)(A). From that point forward, in the

absence of an FCIC non-compliance determination, Finneman was highly unlikely to recover the disputed indemnity. The court's order in the related litigation vacating the arbitration award served only to confirm that recovery was contingent on a non-compliance determination. *See ProAg v. Finneman*, No. 5:22-CV-05062-KES, 2024 WL 3347238 (D.S.D. July 9, 2024). Under the court's order, the arbitrator must now render a decision consistent with the FCIC's determination that revenue from C&D Acres is allowable revenue under the policy, or face vacatur again for disregarding an existing FCIC policy or procedure interpretation. *See id.* at *9. The court explained that automatic nullification pursuant to 7 C.F.R. § 400.766(b)(4)(ii)(a) "is result of administrative actions that are given effect by vacatur." *Id.* at *8. Thus, during the period after the FCIC determination automatically nullified the arbitration award but prior to the award's formal vacatur by the court, it was already clear that recovery of the disputed indemnity by Finneman would very likely require a claim for extracontractual damages, and ultimately hinge on a non-compliance determination.

Under such circumstances, a plaintiffs' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Here, the predictable effect of the FCIC's decision to automatically nullify the arbitration award on the grounds that the arbitrator failed to seek a policy or procedure

interpretation, was vacatur and a new arbitration award that does not grant Finneman the disputed indemnity.

Finneman's alleged injury is also dissimilar from the injuries held to be speculative in prior cases. *See Lujan*, 504 U.S. at 556 (intention of members of environmental organization to visit foreign countries on an undetermined date to view endangered animals was too speculative to support standing); *TransUnion LLC v. Ramirez,* 594 U.S. 413, 434 (2021) (holding that "mere existence of inaccurate information in a database is insufficient to confer Article III standing" where that information has not yet been disseminated to third parties). Unlike in *Lujan* and *Transunion*, where the plaintiffs' injuries were remote, when Finneman brought this action he had already suffered a real pecuniary loss. A cloud of uncertainty that made recovery absent a non-compliance determination virtually impossible was cast over the nullified arbitration award once the FCIC determined a policy or procedure interpretation should have been sought by the Arbitrator. From that point onward, it was very unlikely that Finneman would recover absent an FCIC non-compliance determination. Thus, Finneman's injury is not speculative but rather is concrete and imminent.

### C.    Whether Finneman's injury is traceable to defendants

Defendants argue that Finneman cannot establish standing because his injury is not traceable to them. Docket 38 at 9. They contend that Finneman's indemnity claim was denied by ProAg without any involvement by the FCIC, and that the denial of indemnity occurred before the FCIC declined to issue a

non-compliance determination. *Id.* Defendants contend that they "have no control over Prog Ag [sic], no privity with Plaintiff's policy, and no role in the coverage decisions." *Id.*

Finneman's asserted injury on all four claims is the receipt of a payment from ProAG less than the indemnity owed under the policy. Docket 22 ¶ 46(a)–(d). But Finneman's injury is more precisely described not as the receipt of a lesser indemnity payment, but rather, the loss of claims for extracontractual damages that would allow him to recover the full indemnity. Finneman's inability to recover the indemnity owed by bringing extracontractual claims is directly traceable the FCIC's decision not to issue a non-compliance determination.

In short, Finneman suffered an injury in fact, that is, the loss of the ability to maintain claims by which he may yet recover the disputed indemnity. Furthermore, that injury is fairly traceable to defendants' decision not to issue a non-compliance determination. Finally, the harm could be redressed by a favorable judicial decision ordering defendants to provide a non-compliance determination. Thus, Finneman meets the requirements of Article III standing, and the court will now consider the merits of Finneman's action seeking judicial review of the Director Review Determination.

## II.  Review of the RMA decision that the 2017 WFRP Pilot Policy and related regulations do not allow for a non-compliance determination

Finneman seeks review and reversal of the adverse agency determination that the 2017 WFRP Pilot Policy does not allow the FCIC to issue a non-compliance determination. Docket 22 ¶¶ 45–46. He asks the court to set aside

the agency action on the grounds that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, unsupported by substantial evidence, and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. *Id.* ¶¶ 6, 46.

### A.    Standard of Review Applicable to the Director Review Determination

Final determinations by the NAD Director are reviewable and enforceable by the United States District Court. 7 U.S.C. § 6999. The APA sets out the applicable standards of review. *See id.* (making a final NAD determination reviewable "in accordance with chapter 7 of title 5"). The scope of review provisions require:

> [t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) [omitted].
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > (B) contrary to constitutional right, power, privilege, or immunity;
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > (D) without observance of procedure required by law;
> > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of any agency hearing provided by statute; or
> > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2)(A)–(F).

Finneman's complaint asserts that the court should "set aside the Defendants' adverse determination in accordance with 5 U.S.C. § 706(2)(A)."

Docket 22 ¶ 43. Thus, Finneman clearly asserts that the arbitrary and capricious standard of review applies. But in his cause of action, Finneman quotes the language from 5 U.S.C. § 706(2)(E), and (F). *See* Docket 22 ¶¶ 6, 46. Therefore, Finneman appears to also challenge the decision under the substantial evidence standard of review. Defendants assert that the correct standard is substantial evidence review under § 706(2)(E). Docket 36; Docket 38 at 10. But defendants also argue that the Director Review Determination was not arbitrary and capricious under § 706(2)(A). *Id.* at 13–15. The court now considers what standard of review to apply to the Director Review Determination.

The Eighth Circuit has applied both the "arbitrary and capricious" and "substantial evidence" standards when reviewing a decision by the NAD Director pursuant to 7 C.F.R. § 11.9. *See Dawson Farms v. Risk Mgmt. Agency*, 698 F.3d 1079, 1082–84 (8th Cir. 2012) (holding that a final decision by a NAD deputy director affirming a hearing officer's opinion satisfied both the arbitrary and capricious and substantial evidence tests).

The Eighth Circuit previously held that the question of which APA standard to apply turned on whether the agency's conclusions were factual or legal:

> Under [the arbitrary and capricious standard] we must affirm the [Agency's] conclusions of law unless the same are arbitrary, capricious, an abuse of discretion or otherwise contrary to law. 5 U.S.C. 706(2)(A). We must also accept the agency's factual findings if they are supported by substantial evidence. 5 U.S.C. 706(2)(E).

*Maverick Transp., LLC v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 739 F.3d 1149,

1153 (8th Cir. 2014); *see also Anderson v. Farm Serv. Agency of U.S. Dep't of*

*Agric.*, 534 F.3d 811, 814 (8th Cir. 2008) ("We review the [agency's] factual

determinations for substantial evidence in the record, and will reverse if the

decision is arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.").

But the Supreme Court's recent decision overturning *Chevron* deference

calls into question the applicability of the arbitrary and capricious standard to

agency legal conclusions. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244

(2024) (overruling *Chevron* and holding that an agency interpretation of its

enabling statute is not entitled to special deference by the court). In *Loper*, the

Supreme Court reasoned that:

> The APA . . . codifies for agency cases the unremarkable, yet
> elemental proposition reflected by judicial practice dating back to
> *Marbury*: that courts decide legal questions by applying their own
> judgment. It specifies that courts, not agencies, will decide "*all*
> relevant questions of law" arising on review of agency action, § 706
> (emphasis added)—even those involving ambiguous laws—and set
> aside any such action inconsistent with the law as they interpret it.
> And it prescribes no deferential standard for courts to employ in
> answering those legal questions. That omission is telling, because
> Section 706 does mandate that judicial review of agency
> policymaking and factfinding be deferential.

*Id.* at 2261 (citing 5 U.S.C. §§ 702(2)(A), (E)). Thus, based on *Loper*, agency

policymaking and factfinding are spheres to which the deferential standard of

arbitrary and capricious review at § 706 would apply. In a post-*Loper* decision,

the Eighth Circuit identified the applicable standard of review of agency action

as arbitrary and capricious, but also said that "[w]e review the agency's legal

determinations de novo and its factual findings for substantial evidence on the record as a whole, considering evidence that both supports and detracts from the ALJ's decision." *Carter v. Sec., Dep't of Lab.*, 108 F.4th 1028, 1033 (8th Cir. 2024) (internal quotation marks omitted). Nonetheless, the NAD Director is required to base his determination "on information from the case record, *laws applicable to the matter at issue*, and applicable regulations[.]" 5 U.S.C. § 6998(c) (emphasis added). *Loper* eliminates deference to agency interpretations of their enabling statutes, but it remains unclear whether NAD determinations that are based on applicable law as required by 5 U.S.C. § 6998(c), and that present mixed questions of law and fact, are to be reviewed under the arbitrary and capricious standard, or de novo.

Some courts have analyzed whether the agency action at issue is formal or informal, then applied the substantial evidence standard to "formal" agency action and the arbitrary and capricious standard to "informal" agency action. *See e.g., Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573–74 (10th Cir. 1994); *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) (discussing arbitrary and capricious standard and its application to informal agency actions); *Devon Energy Prod. Co., L.P. v. Gould*, 421 F. Supp. 3d 1213, 1221 (D. Wyo. 2019); *Simko v. BIA*, 156 F. Supp. 3d 300, 307 (D. Conn. 2015) ("[T]he substantial evidence test of section 706(2)(E) is only applicable to judicial review of agency action taken after a formal hearing on the record."). Formal agency action is subject to the APA provisions at 5 U.S.C. §§ 556–57 which "provide formal procedures to which an agency must adhere when the

matter before the agency is 'required by statute to be determined on the record after opportunity for an agency hearing.' " *Simko*, 156 F. Supp. 3d at 307 (quoting 5 U.S.C. § 554(a)). The APA makes formal adjudications subject to the substantial evidence standard by stating that, "in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute[,]" agency action shall be set aside where "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). NAD proceedings are required to be "on the record" within the meaning of the APA, and thus, are formal actions to which the substantial evidence standard of review applies. *See Lane v. U.S. Dep't of Agric.*, 120 F.3d 106, 108–09 (8th Cir. 1997) (holding that even though NAD hearings are not explicitly required to be on the record, they are formal adjudications under 5 U.S.C. § 554); 5 U.S.C. § 556 ("This section applies . . . to hearings required by Sections 553 or 554 of this title[.]")

Complicating matters further, the arbitrary and capricious standard of review may "in some instances converge with the substantial evidence standard." *Devon*, 421 F. Supp. 3d at 1221 (cleaned up). For example, in *Dawson Farms*, the Eighth Circuit applied the arbitrary and capricious standard to a NAD final decision, but ultimately considered whether the Deputy Director's decision was supported by substantial evidence in applying the arbitrary and capricious standard. *See id.* In that case, the Eighth Circuit did not rely on the formal and informal agency action distinction in reviewing a final decision by the NAD Deputy Director. *See Dawson Farms*, 698 F.3d at 1079–84. Instead, the Eighth Circuit cited the applicable regulation requiring

that the NAD director review the lower ALJ decision for "substantial evidence." *See id.* at 1083 (citing 7 C.F.R. § 11.9(d)(1)). The court's reasoning defied easy delineation between standards at § 706(2)(a) and § 706(2)(E) by stating that its task was "to determine whether the deputy director correctly reviewed the hearing officer's decision for substantial evidence, or whether his decision so departed from that standard of review that he acted arbitrarily or capriciously, or otherwise abused his discretion." *Id.* But the convergence of the standards did not stop there: separate from considering whether the deputy director properly reviewed the ALJ decision for substantial evidence, the court weighed whether the deputy director's determination was supported by substantial evidence under § 706(2)(E). *See id.* at 1083–84.

The pervasive overlap between the APA standards of review is perhaps best reconciled by Justice Scalia when he sat on the D.C. Circuit:

> The "scope of review" provisions of the APA, 5 U.S.C. § 706(2),5 are cumulative. Thus, an agency action which is supported by the required substantial evidence may in another regard be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"—for example, because it is an abrupt and unexplained departure from agency precedent. Paragraph (A) of subsection 706(2)—the "arbitrary or capricious" provision—is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs.

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984).

The court finds that both the arbitrary and capricious and substantial evidence standards apply to the court's review of the Director Final Determination. The court's decision to analyze the Director Final

Determination under both standards of review is guided by the Eighth Circuit's reasoning in *Dawson Farms*, where both standards of review were applied to the Deputy Director's decision. *See Dawson Farms*, 698 F.3d at 1082–85. It is also instructive that district courts within the Eighth Circuit have applied the arbitrary and capricious standard of review to NAD final determinations. *See Branstad v. Veneman*, 212 F. Supp. 2d 976, 988–90 (N.D. Iowa 2002); *Anderson v. Farm Serv. Agency*, 502 F. Supp 924, 927 (D. Minn. 2007). Moreover, NAD hearings are formal adjudications held "on the record" and thus substantial evidence review of the Director's factual conclusions is also appropriate. *See Lane*, 120 F.3d at 108–09.

The court's discussion thus far has focused on the applicability of the standards at § 706(2)(A) and (E). The court now addresses whether review under 706(2)(F) is warranted and finds that the standard of review at § 706(2)(F) does not apply in this action. De novo review of the record under 706(2)(F) is applicable " 'when the action is adjudicatory in nature and the agency fact-finding procedures are inadequate' " or " 'when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.' " *United States v. Means*, 627 F. Supp 247, 255–56 (D.S.D. 1985) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)). Here, the agency action is adjudicatory in nature. In fact, Finneman merely quotes the 706(2)(F) standard of review in his cause of action and does not allege any specific inadequacies in the agency's factfinding procedures. *See* Docket 22 at 10; *see generally* Docket 41. Finneman acknowledges that "the

question presented is a purely legal one." Docket 41 at 7. Thus, the standard of review at § 706(2)(F) does not require de novo review of the facts in this action.

The court first considers whether the Director Review Determination is supported by substantial evidence under § 706(2)(E), then weighs whether the arbitrary and capricious standard at § 706(2)(A) is satisfied.

### B. Whether the Director Review Determination was supported by substantial evidence

"Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the [agency's] conclusion." *Maverick Transp., LLC*, 739 F.3d at 1153 (quoting *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008) (alteration in original)). The APA's substantial evidence "standard of review is a narrow one and the court is not permitted to substitute its judgment for that of the agency." *Id.* (quoting *United States v. Massey*, 380 F.3d 437, 440 (8th Cir. 2004)). "We ask only whether there is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Dawson Farms*, 698 F.3d at 1084 (quoting *Valkering, USA, Inc. v. USDA*, 48 F.3d 305, 307 (8th Cir. 1996)).

The facts underlying the Director Review Determination are not in dispute. Moreover, the factual background set out by Director Wood is sufficient to support the determination's conclusions. Of particular importance is the Director's finding that the 2017 WFRP Pilot Policy does not contain a § 20(i) provision. *See* Docket 1-17 at 2, 4. This finding is not contested, and is the primary basis for the Director's decision. *See id.* at 2–3 (citing the ALJ decision below and discussing the lack of a 20(i) provision within the 2017

WFRP Pilot Policy). Because Finneman does not challenge the Director Review Determination's specific factual findings, and the dispute does not depend on differing interpretations of the facts, the court finds that the Director Review Determination is supported by substantial evidence.

### C.    Whether the Director Review Determination was Arbitrary and Capricious

An agency decision is arbitrary and capricious where it:

> [R]elied on factors which congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could be ascribed to a difference in view or the product of agency expertise.

*C. S.D. Co-op. Grazing Dist. v. Sec. of U.S. Dep't of Agric.*, 266 F.3d 889, 894 (8th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Midland Farms, LLC v. U.S. Dep't of Agric.*, 2015 WL 4603261, at *2 (D.S.D. July 29, 2015). If "resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible agencies.' " *C. S.D. Co-op. Grazing Dist.*, 266 F.3d at 894–95 (quoting *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1121 (8th Cir. 1999)). "The agency must articulate a 'rational connection between the facts found and the choice made.' " *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The court may not supply a reasoned basis for the agency's action that is not provided, but "will uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned. *Id.* at 286–87. "Arbitrary and capricious review under the APA focuses on the reasonableness of the agency's decision-making processes rather than on the reasonableness of its interpretation." *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999) (cleaned up).

The court does not limit its "arbitrary and capricious analysis" to whether Director Woods followed the applicable standard of review at 7 C.F.R. § 11.9(d)(1) and instead applies the full range of arbitrary and capricious factors. In *Dawson Farms*, the Eighth Circuit analyzed whether a determination by the RMA Deputy Director was arbitrary and capricious and was supported by substantial evidence under § 706(2)(A) and (E). *Dawson Farms*, 698 F.3d at 1083. The court limited its analysis of the arbitrary and capricious standard to whether the deputy director complied with 7 C.F.R. § 11.9(d)(1) and reviewed the ALJ decision below for substantial evidence. *See id.*

In *Dawson Farms*, the plaintiff argued that the NAD Deputy Director conducted additional factfinding beyond what was present in the record. *See id.* The Deputy Director was tasked with considering whether insurance company adjusters had improperly failed to gather a second sample of potatoes in order to check for rot in a potato crop on which the claim was made. *Id.* at 1081–82. The agency decision challenged in *Dawson Farms* was primarily factual and hinged on the credibility of witnesses and their ability to observe the potatoes in the warehouse. *See id.* Thus, applying only the "substantial evidence" standard of review analysis at 7 C.F.R. § 11.9(d)(1) was logical. *See id.* at 1082. Moreover, the plaintiff's only arguments were that the deputy

30

director applied an incorrect standard of review, and that there was not substantial evidence to support the final agency determination. *Id.* The court responded to those arguments by analyzing whether the "substantial evidence" standard of review at 7 C.F.R. § 11.9(d)(1) was followed when engaging in the arbitrary and capricious analysis, and separately considering whether the deputy director's decision was supported by substantial evidence under § 706(2)(E). *See id.* at 1082–84.

Unlike in *Dawson Farms*, Director Wood's analysis was not primarily factual, and instead required application of relevant law and regulations. *See* Docket 1-17 at 3–4; *P. Life Ins. Co. v. Blevins*, 92 F.4th 734, 737 (8th Cir. 2024) (quoting *Weitz Co. LLC v. MacKenzie House, LLC*, 665 F.3d 970, 975 (8th Cir. 2012)) ("The interpretation of a contract is a question of law[.]"). Resolution of the controversy here does not depend on factual issues that would affect the rights of the parties under the contract; rather, what is at issue is the interpretation of the 2017 WFRP Pilot Policy itself, and specifically whether it precludes the issuance of a non-compliance determination. Thus, it would be inadequate to look solely to whether Director Woods complied with the standard of review at 7 C.F.R. § 11.9(d)(1) to determine whether the Director Review Determination was arbitrary and capricious. The court instead weighs all of the considerations relevant to whether a decision is arbitrary and capricious under § 706(2)(A). *See C. S.D. Co-op. Grazing Dist.*, 266 F.3d at 894 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 29). The court's decision is also guided by the practice of other district courts that considered the full range of

31

arbitrary and capricious factors when reviewing a NAD director's determination governed by the "substantial evidence" standard of review found at 7 C.F.R. § 11.9(d)(1). *See Ortiz v. U.S. Gov't through Perdue*, 2023 WL 3455584, at *2, 6–7 (D. Or. May 15, 2023) (considering whether NAD Director "failed to consider an important aspect of a problem or . . . offered an explanation for the decision contrary to the evidence"); *Epp v. Nat. Res. Conservation Serv.*, 425 F. Supp. 3d 1142, 1147 (D. Neb. 2019); *Simmons v. Smith*, 888 F.3d 994, 998 (8th Cir. 2018) (citing the full range of arbitrary and capricious factors when reviewing NAD deputy director determination).

First, the court considers whether Director Wood's decision "relied on factors which congress" did not intend the RMA to consider. *See id.* Congress has legislated that when reviewing a hearing officer's determination, the RMA director shall use "the case record, the record from the evidentiary hearing under [7 U.S.C. § 6997], the request for review, and such other arguments or other information as may be accepted by the Director." 7 U.S.C. § 6998(b). The Director's determination:

> [S]hall be based on information from the case record, laws applicable to the matter at issue, and applicable regulations published in the Federal Register and in effect on the date of the adverse decision or the date on which the acts that gave rise to the adverse decision occurred, whichever date is appropriate.

7 U.S.C. § 6998(c). Here, Director Wood's decision was based on the case record, the law, and applicable regulations. *See generally* Docket 1-17. Director Wood cited legal authorities, including the Supremacy Clause and 7 C.F.R.

§ 400.352. *See* Docket 1-17 at 3. He also relied on the administrative record in his rendition of the case's factual background. *See* Docket 1-17 at 1–2.

Director Wood applied the correct standard of review and reviewed the ALJ decision to ensure it was supported by substantial evidence. 7 C.F.R. § 11.9(d)(1). Under this standard of review, the NAD Director must consider the hearing officer's decision, but may also look beyond facts the hearing officer explicitly found in his decision and examine the underlying record. *Dawson Farms*, 698 F.3d at 1083. Although Director Wood did not cite the substantial evidence standard of review, he applied it. The Director Review Determination cited the ALJ decision below and does not go beyond the facts explicitly found by the ALJ. *See* Docket 1-15 at 2–3; Docket 1-17 at 2–3. Director Wood also indicated that he based his decision on a review of the record, saying that "[b]ased on my review of the record, I uphold the Appeal Determination." Docket 1-17 at 1. Although it would be clearer if Director Woods cited the applicable standard of review, because his decision discussed the ALJ decision and the facts supporting it, the court finds that he reviewed it for substantial evidence as required by 7 C.F.R. § 11.9(d)(1). In short, Director Wood did not base his decision on factors not approved by Congress, and the Director Review Determination survives the first step of the arbitrary and capricious analysis.

Second, the court considers whether Director Wood entirely failed to consider an important aspect of the problem. *See C. S.D. Co-op. Grazing Dist.*, 266 F.3d at 894 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 29). The issue of whether a farmer insured under 2017 WFRP Pilot Policy may obtain a non-

compliance determination from the FCIC requires interpretation of both the contract and the regulatory scheme governing crop insurance. The ALJ's decision below considered applicable law on the issue of whether the absence of § 20(i) from the contract excluded the possibility of obtaining a non-compliance determination. *See* Docket 1-15 at 6. The ALJ discussed the FCIC regulation that precludes certain types of damages in the absence of a non-compliance determination. *See id.* (citing 7 C.F.R. § 400.176(b)). The ALJ also cited caselaw in support of his conclusion that because the contract did not provide a procedure to obtain a non-compliance determination, the ability to obtain one is implicitly excluded. *See* Docket 1-15 at 6 (citing *Hawkins v. U.S.*, 96 U.S. 689, 697–98 (1877)).

Director Wood's decision, on the other hand, did not discuss the legal maxim that, in the ALJ's view, precluded the insertion of a provision to obtain a non-compliance determination into 2017 WFRP Pilot Policy. *See* Docket 1-17 at 3–4; Docket 1-15 at 6 ("The legal maxim '*expressio unius est exclusio alterius*' is an interpretive maxim meaning that if certain things are specified in a law, contract, or will, other things are implicitly excluded.").

Director Wood also did not provide any analysis as to why § 400.352 and § 400.176(b) do not empower the agency to issue a non-compliance determination even if a § 20(i) provision is not present in the insured's policy. *See* Docket 1-17 at 3–4. Section 400.352(b)(4) bars various extracontractual damages and states that "[n]othing herein precludes [extracontractual damages] from being imposed . . . if a determination is obtained from the FCIC

34

that the company, its employee, agent or loss adjuster failed to comply with the terms of the policy or procedures." 7 C.F.R. § 400.352(b)(4). The language at § 400.176(b) is similar:

> No policy or insurance reinsured by the Corporation and no claim, settlement, or adjustment action with respect any such policy shall provide a basis for a claim of punitive or compensatory damages or an award of attorney fees or other costs against the Company issuing such a policy, *unless a determination is obtained from the Corporation that the Company, its employee, agent or loss adjuster failed to comply with the terms of the policy or procedures issued by the Corporation and such failure resulted in the insured receiving a payment in an amount that is less than the amount to which the insured was entitled.*

7 C.F.R. § 400.176(b) (emphasis added). And both regulations are largely coextensive with the model policy provision found at § 20(i):

> (i) In a judicial review only, you may recover attorney's fees or other expenses, or any punitive, compensatory or any other damages from us *only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled.* Requests for such a determination should be addressed to the following: USDA/RMA/Deputy Administrator of Compliance/Stop 0806, 1400 Independence Avenue, SW., Washington, DC 20250-0806.

7 C.F.R. § 457.8(b).

A previous RMA Final Agency Determination considered the preemptive language at § 400.176 to be equivalent to § 20(i) of the Common Crop Policy Basic Provisions barring extracontractual damages. *See* RMA Final Agency Determination 240 (U.S.D.A. 2015) ("FCIC also agrees that 7 C.F.R. § 400.176(b), and the equivalent language in section 20(i) of the Basic Provisions preempts any state law claims that are in conflict."). Similarly, in

another Final Agency Determination, the FCIC contemplated that § 20(i) and § 400.352 are equivalent provisions, stating that:

> [A]ny claim, including a claim for extra-contractual damages, that arises under or is related to a Federal crop insurance policy issued pursuant to the Federal Crop Insurance Act (Act) may only be awarded if a determination is obtained from FCIC *in accordance with section 20(i) of the Common Crop Insurance Policy Basic Provisions and § 400.352.*

RMA Final Agency Determination 240 (U.S.D.A. 2015) (emphasis added).

Director Wood cited 7 C.F.R. § 400.352 and acknowledged Finneman's argument that the regulation required the RMA to issue a non-compliance determination even for crop insurance policies lacking a § 20(i) provision.[4] *See id.* at 4. Director Wood also identified the issue to be determined as "whether RMA properly declined to issue a determination that the AIP failed to comply with Appellant's 2017 policy or with agency rules," and correctly stated that "[t]o resolve this issue, I must decide whether RMA properly applied its regulations governing non-compliance determinations." *Id.* at 1. But the Director's analysis of why § 400.352 does not allow for farmers insured under the 2017 WFRP Pilot Policy to obtain a non-compliance determination was limited and conclusory. He said only "that NAD cannot insert a provision into a crop insurance contract that is not there." *Id.* Director Wood further reasoned that "Appellant's 2017 WFRP pilot policy simply has no provision for RMA to determine whether the AIP failed to comply, nor does it have a provision to

---

[4] The Director Review Determination does not cite 7 C.F.R. § 400.176(b). *See generally* Docket 1-17.

determine whether such non-compliance caused Appellant to receive a lower payment." *Id.*

The Director Review Determination failed to engage in statutory interpretation to determine whether § 400.352 and § 400.176 independently allow for the parties to request a non-compliance determination. "The rules of statutory construction apply when interpreting an agency regulation." *Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006). When constructing the meaning of a regulation, the "inquiry begins with the [regulation's] plain language." *United States v. Stanko*, 491 F.3d 408, 413 (8th Cir. 2007). Interpretations of a regulation that render certain words redundant or sections superfluous should be avoided. *Id.* The Director Review Determination did not apply conventional rules of statutory and regulatory construction to 7 C.F.R. § 400.352(a), and instead began and ended its analysis at the 2017 WFRP Pilot Policy's lack of a § 20(i) provision. *See* Docket 1-17 at 3–4. The court takes no position on whether § 400.352 and § 40.176(b) independently empower the agency to issue a non-compliance determination to an insured whose policy lacks a § 20(i) provision, but the Director's failure to consider this important aspect of the problem makes his determination appear arbitrary at first blush.

"Where a regulation's plain language does not control the issue, we must uphold an agency's interpretation of its own regulation unless that interpretation is 'plainly erroneous or inconsistent with the regulation.' " *St. Luke's Methodist Hosp. v. Thompson*, 315 F.3d 984, 987 (8th Cir. 2003) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see*

37

*also Kisor v.* Wilkie, 588 U.S. 558, 563-64 (2019) (holding that deference to "agencies' reasonable readings of genuinely ambiguous regulations" is "sometimes appropriate" and "depends on a range of considerations"). But here, the Director Review Determination did not provide any analysis as to why the FCIC regulations governing non-compliance determinations do not independently allow a farmer insured under the 2017 WFRP Pilot Policy to request a non-compliance determination.

Moreover, the court cannot substitute the reasoning of the ALJ for that of Director Wood, because "the analysis for arbitrary and capricious decision-making focuses on the Director's decision." *PM Farms, Inc. v. Young*, 233 F. Supp. 3d 706, 713 (S.D. Iowa 2017) (citing *Payton v. U.S. Dep't of Agric.*, 337 F.3d 1163, 1169 (10th Cir. 2003)). "The Administrative Judge's decision is not irrelevant, but it is the Director's decision that is under review." *Farms, Inc. v. Young*, 233 F. Supp. 3d 706, 713 (S.D. Iowa 2017).

In a footnote, Director Wood cited a prior determination, Case No. 2020W000319, in which he considered whether the FICC could issue a non-compliance determination to a farmer insured under the 2016 WFRP Pilot Policy, which like the 2017 version lacked a § 20(i) provision. *See* Docket 1-17 at 4 n.3. The cited excerpt reasoned that the "Appellant's 2016 WFRP Policy did not call on RMA to determine whether the Interested Party failed to comply with the terms of the Policy or FCIC procedures and whether such non-compliance resulted in Appellant receiving a lower payment." *See id.* Director Wood, in a footnote, stated that Finneman "does not persuade me that this reasoning does

not apply to his case." *Id.* But even if the Director Review Determination fully incorporated the previous determination by citing the decision, the previous determination's reasoning is only marginally more extensive than the single sentence cited above. *See* Docket 26 at 22–23. In the prior determination, Director Wood also did not engage in a process of statutory interpretation to determine whether § 400.352 and § 400.176(b) empower the FCIC to issue a non-compliance determination in a contract that lacks a § 20(i) provision. *See* Docket 26 at 22–23. He also did not cite law in support of his conclusion that the lack of a § 20(i) provision in the 2016 WFRP Pilot Policy disempowered the FCIC from issuing a non-compliance determination. *See id.* Thus, the prior determination from Case No. 2020W000319 cited by the Director does not sufficiently grapple with § 400.352 and § 400.176(b) and the regulatory scheme as a whole for the court to change its calculus as to whether the Director Review Determination entirely failed to consider an important aspect of the problem.

The Director Review Determination cited no caselaw to support its conclusion that the absence of § 20(i) from the 2017 WFRP Pilot Policy precludes the issuance of a non-compliance determination because the NAD cannot insert such a provision into the contract. *See generally* Docket 1-17. Unlike the ALJ decision below, it did not invoke the doctrine of "*expression unius est exclusion alterius*" in support of its conclusion that a § 20(i) provision cannot be read in to the 2017 WFRP Pilot Policy. *See generally id.*; Docket 1-15 at 6. Most importantly, the Director Review Determination did not engage in

statutory interpretation or otherwise endeavor to resolve the issue of whether the statutory scheme interpreted as a whole, and § 400.352 and § 400.176(b) in particular, permit the FCIC to issue a non-compliance determination to a producer insured under the 2017 WFRP Pilot Policy. Thus, the agency's decision entirely failed to consider an important aspect of the problem, and accordingly, the court finds that the Director Review Determination is arbitrary and capricious.

The court does not consider whether the RMA "offered an explanation for its decision that runs counter to the evidence before the agency." *C. S.D. Co-op. Grazing Dist.*, 266 F.3d at 894 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 29). The arbitrary and capricious aspect of the Director Review Determination is not rooted in a misapplication of the factual record, but rather stems from the wholesale absence of reasoning on a critical issue. The court also does not find the Director Review Determination's overall conclusion "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 29). Nonetheless, the Director Review Determination's failure to analyze whether the regulations at § 400.352 and § 400.176(b) empower the agency to issue a non-compliance determination, and its failure to support its conclusion that it is explicitly excluded because a § 20(i) provision is not included in the 2017 WFRP Pilot Policy, renders the Director Review Determination arbitrary and capricious.

III.    **Whether Finneman's request for a non-compliance determination should be remanded back to the agency**

Now that the court has determined that the Director Review Determination failed to consider an important aspect of the problem and is therefore is arbitrary and capricious, the court must determine the appropriate remedy. Finneman's motion for summary judgement asks the court to consider the merits of the issue of whether the RMA and FCIC are obligated to provide a non-compliance determination under the 2017 WFRP Pilot Policy. Docket 39 at 2.

"An administrative remand may be appropriate when an agency procedurally errs by failing to articulate a reasoned basis for its decision. When an agency legally errs by acting outside its statutory authority, a remand would be futile and improper." *Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 901 (8th Cir. 2013); *see also J.O.C. Farms, LLC. v. Rural Cmty. Ins. Agency, Inc.*, 131 F. Supp. 3d 514, 529 (E.D.N.C. 2015) (remanding case to NAD Director after court found that the final agency decision was not supported by substantial evidence). Here, the agency has not acted outside of its authority, but rather has failed to consider an important aspect of the problem and thus acted arbitrarily and capriciously. Thus, remand is the appropriate remedy. On remand, the agency must provide a reasoned basis for its determination and consider whether the regulations at § 400.352 and § 400.176(b) provide an independent basis for the issuance of a non-compliance determination under the 2017 WFRP Pilot Policy.

**CONCLUSION**

Thus, it is ORDERED that:

(1) Defendants' motion for summary judgment is denied.

(2) Plaintiff's motion for summary judgement is denied.

(3) Plaintiff's request for Director Review is remanded to the National

Appeals Division for further proceedings consistent with the court's

order.

Dated December 17, 2024

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE